IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROBERT ARTIS,

                           Plaintiff,                     OPINION AND ORDER

     v.

                                                    19-cv-303-wmc

SEAN PRICE, BRITTANY HIBMA[1],
THEODORE ANDERSON and
RICHARD GIROUX,

                           Defendants.

---

     Plaintiff Robert Artis claims that certain employees at Columbia Correctional Institution violated his Eighth Amendment rights. Specifically, Artis was granted leave to proceed *pro se* on claims that: defendants Sean Price and Brittany Hibma acted with deliberate indifference to his threats of self-harm; and defendants Theodore Anderson and Richard Giroux acted with deliberate indifference to his conditions of confinement during a six-day period in 2018. Before the court is defendants' motion for summary judgment, seeking summary judgment with respect to both claims based on a lack of evidence that plaintiff suffered any cognizable harm or injury with respect to both claims and his failure to present evidence to support the objective prong of the conditions of confinement claim. (Dkt. #28.) For the reasons that follow, the court will grant defendants' motion as to plaintiff's claims against defendants Price and Hibma, but will reserve on defendants' motion as to plaintiff's claims against defendants Anderson and Giroux, providing one last opportunity to plaintiff to supplement the evidence as to his conditions of confinement.

---

[1] The court notes that this defendant's last name was incorrectly spelled Himba. The court has corrected the spelling in this opinion and order.

UNDISPUTED FACTS[2]

### A. Background

Plaintiff Robert Artis is a state prisoner who was incarcerated at Columbia Correctional Institution in July and August 2018.

Defendant Brittany Hibma is currently employed by the Department of Corrections ("DOC") at Columba as a Correctional Sergeant. In the summer of 2018, Hibma was employed at Columbia as a Correctional Officer. Defendant Sean Price is currently employed with the DOC at Columbia as a Correctional Sergeant, and he has held that position since May 2018. Defendant Richard Giroux was employed by DOC at Columbia as a Supervising Officer 1 (Lieutenant) from October 2016 through March 2, 2019. Finally, defendant Theodore Anderson was employed by DOC at Columbia as a Supervising Officer 2 (Captain) from February 17, 2019, until August 2020.[3]

Columbia is a maximum-security correctional facility for adult males located in Portage, Wisconsin. Inmates are housed in general population or restrictive housing, formerly known as segregation. There are two forms of restrictive housing: Restrictive Housing Unit 1 ("RHU1") located in the main administrative building and Restrictive Housing Unit 2 ("RHU2") located in each housing unit. In general, restrictive housing is where inmates are sent for violating prison rules or because they pose a risk to themselves,

---

[2] Unless otherwise noted, the court finds the following facts material and undisputed, viewed in the light most favorable to plaintiff as the nonmoving party.

[3] The court assumes that the start date provided by defendants must be in error given that there appears to be no dispute that defendant Anderson was working at Columbia during the period relevant to Artis's claims.

staff or the institution. In total, there are 40 cells classified as restrictive housing -- 12 double cells and 28 single cells. Cells in restrictive housing are approximately eight feet wide and 11 feet long, with a window in the door that measures approximately 18 inches long by four inches wide. Each cell is equipped with a sink, toilet, light, concrete bed frame, mattress and a pillow.

All the cells in RHU1 are equipped with a dimmer light and a bright light, both controlled by officers. Defendants maintain that the dimmer light stays on at all times, while the bright light is turned off at night. However, plaintiff Artis disputes that this was his experience when housed in RHU1 and specifically, as described below, not between July 27 and August 2, 2018. Instead, during this period, he maintains that the bright light was on at all times. Regardless, there is no dispute that the dimmer light -- a low, 32-watt fluorescent bulb, behind a frosted light cover -- is kept on 24-hours a day so that staff can observe inmates for safety and security reasons.

Inmates in restrictive housing are allowed two, scheduled shower days per week, and each time, they are provided soap, shampoo, a fresh towel, and a fresh smock or other clothing. Every cell is also equipped with a sink and a water bubbler so inmates have access to drinking water at all times. Still, Artis maintains that he was *not* offered a shower, and the water to his cell was shut off when housed in RHU1 from July 27 through August 2, 2018, also as described in more detail below.

Inmates in restrictive housing eat their meals in their cells, with officers delivering prepared meals to each inmate's cell through traps in the cell door at designated times. Every inmate is to be offered meals three times per day. Officers also deliver medications

to restrictive housing inmates at regularly scheduled times -- morning, noon, 3:00 p.m., and bedtime.[4]

On March 26, 2018, Artis was first placed in RHU1 for purposes of "administrative confinement," which is defined by the DOC's administrative code as

> an involuntary nonpunitive status for the segregated confinement of an inmate whose continued presence in general population poses a serious threat to life, property, self, staff, or other inmates, or to the security or orderly running of the institution.

(Defs.' PFOFs (dkt. #30) ¶ 25 (quoting Wis. Admin. Code DOC § 308.04(1)).)  For reasons that are not entirely clear, Artis went on a hunger strike on July 20, 2018, and then wrote to the Psychological Services Unit ("PSU") and the Health Services Unit ("HSU") on July 22, 2018, complaining that his hunger strike was not being documented.[5]  On July 23, Artis was next found guilty of disruptive conduct and disobeying orders, and given a sanction of 30 days cell confinement.

## B. Events of July 27, 2018

On July 27 at 9:10 a.m., defendants maintain that a nurse walked through RHU1 checking on the inmates as part of the routine HSU rounds on the unit and Artis spoke to the nurse regarding his hunger strike.  While Artis disputes that he had any conversation with a nurse at that time, at around 10:00 a.m., defendant Brittany Hibma, then a

---

[4] The "noon" med pass occurs at the same time lunch is delivered, which usually is around 10:00 a.m., rather than noon.

[5] Defendants also set forth facts concerning a threatened self-harm event on July 3 and 4, but this appears only tangentially related to plaintiff's claim or defendant's motion, and so the court has not included these additional facts.  (Defs.' PFOFs (dkt. #30) ¶¶ 28-36.)

Correctional Officer, walked through RHU1, distributing medications to inmates as part of the noon med pass. Hibma handed Artis a glass fluticasone nasal spray bottle, which he was authorized to use. Typically, Artis would return the spray bottle to the correctional officer after use, but he did not do so that day. Instead, Artis avers that he told Hibma several times that he intended to use it to harm himself, although defendants dispute this. Specifically, Hibma avers in her declaration that *had* Artis threatened harm, she would have relayed that threat to the Sergeant on duty, defendant Sean Price, so that the threat of self-harm could be logged *and* PSU could have been notified. Instead, when questioned by the institutional complaint examiner ("ICE") in response to Artis's administrative complaint, and as reflected in the ICE report itself, Hibma stated that she informed Sergeant Price about Artis refusing to return the spray bottle, but not that Artis threatened to harm himself with it. (Ray Decl., Ex. 1016 (dkt. #37-2) 2.)

At around 1:00 p.m., Sergeant Price next came to Artis's cell asking for the glass bottle back. At that time, Artis avers he also told Price that he was planning on using the glass bottle to harm himself and was feeling suicidal. He contends that Price responded, "I don't care[.] I'm [a]bout to go home in a[n] hour and I w[o]n[']t be back till Tuesday so go ahead." (Pl.'s Add'l PFOFs (dkt. #40) ¶ 7.) While defendants do not dispute for purposes of summary judgment that Price *was* off work until the following Tuesday, Price disputes both this account *and* that he was told Artis intended to harm himself with the bottle. Similarly, had he been informed of Artis's threat of self-harm, Price maintains that he would have notified his superiors and the PSU, as well as documented the incident.

5

In further support of Artis's account of his conversations with Hibma and Price, Artis submitted a declaration by another inmate, Ronelle Booker, who was housed close to him on July 27, and avers that: (1) he heard Artis tell both Hibma and Price that he was feeling suicidal and intended to harm himself with a glass bottle; and (2) they both ignored him. (Booker Decl. (dkt. #40-6).) Booker also avers that he heard Price say, "it's my Friday. I'm going home in a[n] hour." (*Id*.) Moreover, at approximately 2:00 p.m. on July 27, not only was there a shift change, but defendants offer no evidence from Hibma *or* Prince that Artis had returned a glass bottle despite both ordering him to return it.

Around 3:05 p.m., Officer Jarrett Tierney went to Artis's cell for the afternoon med pass and discovered that Artis had harmed himself. Artis claims that he was actively committing self-harm when Tierney came to his cell, and he had to order Artis to stop, but their stories otherwise comport after that: Artis showed Tierney three small lacerations on his arm, each about the size of a pea; Artis said that the first shift officers had not recovered his nasal spray bottle from the earlier med pass; and he had used it to injure his arm. As directed by Tierney, Artis agrees that he also stopped harming himself, then indicated his readiness to be moved to disciplinary segregation.

At that point, Officer Tierney radioed for assistance, and the Captain then on duty, defendant Theodore Anderson, came to Artis's cell. Artis also showed Captain Anderson the small cuts on his arm, along with the broken medication bottle. Tierney next placed Artis's wrists in a tether and restraints through an opening in the cell door for transfer, removed him from his cell, and escorted him to HSU for medical assessment. The nurse also noted "3 sm[all] skin tears > pea size." (Defs.' PFOFs (dkt. #25) ¶ 60 (citing Kinyon

6

Decl., Ex. 1001, Part 11 (dkt. #35-12) 918-19).) While Artis does not dispute this description of his injuries, he points out that no one took photos showing the cuts. The nurse next noted that Artis reported a pain scale of 0 out of 10 and was angry because he had not been seen by HSU for his hunger strike. In contrast, Artis denies ever speaking to a nurse, although acknowledges that he was seen by a nurse, and she cleaned his cuts with saline, antiseptic, and a band-aid. Finally, she told Artis to keep his cuts clean and dry, and to follow-up with HSU if needed.[6]

After his treatment by the nurse, Artis was seen by psychologist Daniel Norge. Dr. Norge's notes reveal that Artis denied suicidal ideation or thoughts of self-harm. Artis purports to dispute this discussion as well, but acknowledges that he spoke with Norge for close to an hour, told him that he was not feeling well that day, but, consistent with Norge's note, Norge asked him not to harm himself and that he would see him on Monday, and Artis agreed to that plan. The parties dispute whether Artis shared with Norge that he harmed himself to be seen by HSU regarding his food intake. Regardless, there is no dispute that Norge determined that clinical observation was not needed, clearing him to be returned to restrictive housing.

### C. Limited Property Status

After consulting with Dr. Norge, Captain Anderson avers that he then decided to place Artis on "limited property status," as a precautionary measure given Artis's self-

---

[6] Artis apparently required no further treatment for this injury. Specifically, he neither requested treatment, nor was he treated for his arm injury during the time he was kept on limited property status from July 27 to August 2.

inflicted injuries. When an inmate is placed on limited property status, all personal clothing and other property is removed from the cell and the inmate is only allowed to have a security smock and a mattress. As an inmate's condition improves, assuming no misuse of the smock or mattress, he gradually regains access to other property. For his part, Artis disputes that Dr. Norge played any role in the decision to place him on limited property status, pointing to Norge's statement during the administrative complaint process, in which he denied having "any input into [a] security decision." (Artis Decl. (dkt. #41) ¶ 15; Pl.'s PFOFs, Ex. D (dkt. #40-4).)

Regardless, Artis was transferred to an RHU cell on July 27, which defendants define as the "more restrictive disciplinary segregation unit," and provided only a mattress and smock as directed by Anderson, and he remained in that cell for six days until August 2, 2018. (Defs.' PFOFs (dkt. #30) ¶ 69.) The parties dispute whether Artis was allowed to take a shower during this time or even whether he had access to toilet paper, but there is no dispute that he was offered three meals a day. While he was apparently provided beverages with his meals, Artis further disputes that he had access to drinking water in his cell, maintaining that Anderson had ordered staff to shut the water off in his cell.

In opposition, Captain Anderson disputes ordering the water to be turned off, and defendants further note that there is "no record of any plumbing issues with the toilet or sink between July 27 and August 2." (Defs.' PFOFs (dkt. #30) ¶ 76.) Anderson also avers that neither Artis, nor anyone else, informed him that there was no running water in his cell. As for the lights, Artis avers that Anderson ordered the bright light in his cell to be left on at all times, and when he complained to defendant Lieutenant Giroux, also a

defendant, about the light on July 30, he was told that the light was on all day and night as a known sleep deprivation tactic. While defendants assert that Artis neither informed them that he had any concerns about the lighting in his cell nor that he was experiencing adverse effects from the light.

In support of his account of the conditions of confinement from July 27 to August 2, Artis again directs the court to another declaration by an inmate, Evan Casey, who avers that: (1) the water in that cell was turned off, *and* when Artis complained about it, staff responded that it was "Anderson's call"; (2) his room lights were on 24/7; and (3) he was denied toilet paper, clothing and a shower, *and* when he made requests for them, staff explained those denials were all due to Anderson as well. (Casey Decl. (dkt. #40-7).)

On July 30, Artis met with Dr. Norge again. Relying on Norge's notes from that meeting, defendants maintain that Artis told him he had harmed himself because he was upset with HSU. Artis purports to dispute this, claiming that he also told Norge that he was feeling stressed, rather than just upset with HSU. (Pl.'s Resp. to Defs.' PFOFs (dkt. #42) ¶ 89.) Artis further told Norge that he wanted his property returned, and Norge informed Artis that he would discuss his request with the security staff. There is no dispute that Lieutenant Giroux restored Artis's personal property, but the parties dispute when this occurred, with plaintiff maintaining that it did not occur until August 2, but defendants contend that it was restored on July 30.

OPINION

Plaintiff asserts claims of deliberate indifference under the Eighth Amendment (1) to his risk of serious bodily harm against defendants Price and Hibma, and (2) to his

conditions of confinement against defendants Anderson and Giroux. Defendants acknowledge disputes of material fact as to certain aspects of both claims, but contend that summary judgment is nevertheless warranted in their favor because plaintiff has failed to put forth evidence to support a finding of a cognizable harm with respect to either claim.

**I. Claim Against Defendants Price and Hibma for Failure to Protect**

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To establish a claim for damages, a "prisoner must provide evidence that he presented an objectively serious medical need that a defendant correctional officer responded to with deliberate indifference, thereby resulting in some injury." *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020) (citing *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (*en banc*)). As the Seventh Circuit has repeatedly held, "suicide is an objectively serious medical condition." *Id.* As such, "prison officials cannot intentionally disregard a known risk that an inmate is suicidal." *Id.* (citing *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019) (collecting cases)).

As indicated above, defendants seek summary judgment on the basis that plaintiff has not identified a cognizable harm. Plaintiff does not dispute defendants' characterization of his injury: three, pea-sized skin tears to his forearm, for which he reported no pain, only required some cleaning and a band-aid, and required no follow-up care. Thus, in support of their motion, defendants cite a number of cases outside of the self-harm or threatened suicide context for the proposition that a scratch or small laceration is not a sufficiently serious medical condition to warrant the need for medical treatment.

*See Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) (pointing out that the Eighth Amendment does not extend to "a tiny scratch"); *Dawes v. Coughlin*, 159 F.3d 1346 (2d Cir. 1998) (affirming summary judgment against plaintiff on claim for denial of medical care involving a "one-and-a-half-inch laceration on his elbow"); *Head-Bey v. Smith*, No. 9:04CV191 LEKDRH, 2007 WL 274793, at *6 (N.D.N.Y. Jan. 26, 2007) (finding that 1½ inch laceration to plaintiff's cheek was "de minimis and thus not sufficiently serious to constitute an Eighth Amendment violation").

Since none involve self-harm, however, all of these cases are readily distinguished from the facts here. Still, defendants also direct the court to a recent Seventh Circuit decision, *Lord v. Beahm*, 952 F.3d 902 (7th Cir. 2020), holding that "an insincere threat of suicide to get attention," coupled with a superficial physical injury, is not sufficient to demonstrate a cognizable harm, affirming the grant of summary judgment in the defendants' favor. *Id.* at 903. In so holding, *Lord* relied heavily on the fact that plaintiff's suicidal threat was "insincere," distinguishing it from other deliberate indifference to self-harm cases where a prisoner raised a genuine issue of material fact warranting a jury trial:

> This case is different, as it reflects an inmate's insincere suicide threat to get attention. Lord was upset that Officer Stoffel would not return to his cell, and he reacted by screaming that he had a blade and was taking his life, only then to inflict minor scratches. Lord did not focus his § 1983 claim on these scratches or, for that matter, on any other physical injury. To the contrary, he focused exclusively on *risk*—on the danger he presented to himself by having a razor blade and the officers then ignoring his unmistakable plea that he intended to kill himself.

*Id.* at 904–05 (emphasis in original); *see also Conery v. Pawlyk*, No. 18-CV-1606-JPS, 2020 WL 5572103, at *4 (E.D. Wis. Sept. 17, 2020) (citing *Lord* and granting summary

11

judgment in defendant's favor based on finding that small laceration, coupled with "insincere threat to get attention or to manipulate others" was not a cognizable injury).

Thankfully, as in *Lord* and *Conery*, there is no dispute that Artis suffered only small skin tears from his self-harm, thus eliminating any claim based on a physical injury. Thus, the question remains whether plaintiff raised a genuine issue of material fact as to the *sincerity* of his original threat of self-harm. Unlike in *Lord* and *Conery*, both correctional officers here knew Artis had a weapon he could use to self-harm in the form of a glass nasal spray bottle, that he not only had no right to keep in his cell, but had twice been ordered to return. Also, unlike in *Lord* and *Conery*, both of the correctional officer defendants claim Artis never threatened self-harm or reported being suicidal, while both Artis and another inmate maintain the opposite. However disturbing those additional facts may be in term of *risk*, there is certainly reason to question or doubt plaintiff's sincerity both in terms of his having an ulterior motive to get attention and a lack of any meaningful injury. In support of that argument, defendants also rightly emphasize Dr. Norde's statements in the record that Artis committed self-harm (such as it was) because he was upset with HSU for ignoring his purported hunger strike. Moreover, Artis neither disputes that he made these statements nor that Norde consequently recorded then in his medical record, but rather contends that it was not *just* frustration with HSU's lack of response to his hunger strike that prompted him to commit self-harm, but that he was also feeling down and stressed. However, this averment stops short of establishing that he had a *sincere* threat of self-harm, much less that a reasonable jury would so find. Given proof of advance motive to get attention by threat *and* Artis's lack of any real injury, as well as admission of motive, after

12

the fact, the court agrees with defendants that *Lord* dictates finding plaintiff failed to raise a genuine material issue of fact as to the sincerity of his threat of self-harm or suicidal ideation to support a failure to protect claim. Therefore, the court will grant summary judgment in defendants Price and Hibma's favor on this claim.[7]

## II. Claim Against Defendants Anderson and Giroux for the Conditions of his Confinement

The Eighth Amendment's prohibition against cruel and unusual punishment imposes upon prison officials the duty to provide prisoners "humane conditions of confinement." *Farmer*, 511 U.S. at 832. To constitute cruel and unusual punishment, conditions of confinement must be extreme. *Id.* To demonstrate that prison conditions violate the Eighth Amendment, therefore, a plaintiff must present evidence that satisfy a test involving both an objective and subjective component. *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). The objective analysis focuses on whether prison conditions were sufficiently serious, so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834, or "exceeded contemporary bounds of decency of a mature, civilized society," *Lunsford*, 17 F.3d at 1579. The subjective component requires proof that prison officials acted wantonly and with

---

[7] As did the Seventh Circuit in *Lord*, this court emphasizes the narrow nature of its ruling: had defendants not shown overwhelming evidence of (1) plaintiff's ulterior motive to gain attention, confirmed by his actions and words both before and after his self-harm *and* (2) a complete lack of anything more than a wholly superficial injury, then this claim of deliberate indifference may well have survived defendants' summary judgment motion, especially given Price's and Hibma's inexplicable and undisputed decision to leave an unauthorized glass bottle in the possession of a plainly disruptive and disgruntled inmate in direct defiance of DOC policy and their own orders to plaintiff.

deliberate indifference to a risk of serious harm to plaintiff. *Id.* Here, defendants also seek summary judgment on plaintiff's conditions-of-confinement claim against defendants Anderson and Giroux because (1) Artis cannot establish a sufficiently serious deprivation and (2) again, he sustained no injuries.

As for defendants' first argument, in his complaint, and in his opposition to summary judgment, Artis alleges other difficult conditions -- namely, cold temperatures and constant lights -- but those allegations do not survive summary judgment. As for the cold temperatures, the challenged limited property placement occurred during the summer and defendants submit facts, which plaintiff does not dispute, the RHU1 does not have air conditioning. Plaintiff purports to dispute this in responding to defendants' proposed finding of fact by claiming that the building has "central air conditioning," citing to his declaration for support, but the cited portion does not challenge defendants' statement that *RHU1* lacks air conditioning. (Pl.'s Resp. to Defs.' PFOFs (dkt. #42) ¶ 84.) On this record, therefore, Artis has failed to raise a genuine issue of material fact as to the temperature in his cell. As for the lights, Artis again fails to raise a genuine issue of material fact challenging defendants' assertion that only the dimmer lights were on 24 hours a day for security purposes. In particular, while Artis contends that the lights were "bright," he failed to offer any *evidence* from which a reasonable jury could conclude that the bright light, rather than just the dimmer light, was left on 24 hours a day. (Pl.'s Resp. to Defs.' PFOFs (dkt. #42) ¶ 15). As for the dimmer light being left on consistently, the Seventh Circuit has already held that "24–hour lighting involving a single, 9–watt fluorescent bulb

14

does not objectively constitute an 'extreme deprivation.'" *Vasquez v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008) (quoting *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997)).

Still, crediting plaintiff's and another inmate's account that was Artis was deprived of running water in his cell, toilet paper and access to a shower for at least six days, this *may be* sufficient for a reasonable jury to find in his favor on the objective component of this claim. As this court recently explained in *Johnson v. Dunahay*, No. 17-cv-941-wmc, 2020 WL 4053972 (W.D. Wis. July 20, 2020), the focus of this type of conditions of confinement claim is "whether the prisoner had the ability to clean himself or his cell." *Id.* at *5. Specifically, as the Seventh Circuit has explained "unhygienic conditions, when combined with the jail's failure to provide detainees with a way to clean for themselves with running water or other supplies, state a claim for relief[.]" *Budd v. Motley*, 71 F.3d 840, 842 (7th Cir. 2013); *see also Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007) (prisoner held in cell for three to six days with no working sink or toilet, floor covered with water and walls smeared with blood and feces stated an Eight Amendment claim). Viewed in isolation, perhaps defendants would have a point. *See, e.g.*, *Dye v. Lemon*, 40 F. App'x 993, 996-97 (7th Cir. 2002) (holding that lack of toilet paper for multiple days does not amount to a constitutional violation). The Seventh Circuit, however, instructs courts to consider the *combined* conditions. *See Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006) ("Some conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so.").

Unlike in each of the above-cited cases, however, Artis stops short of *actually* attesting to the conditions of his cell or of his person during the six-day period. For

15

example, he offers *no* account that the toilet became filled with unflushed feces and urine, that other unsanitary conditions were present in his cell, or that he was unable to clean his body at all during this relatively short time period. Ultimately, the reason why the denial of running water, toilet paper and a shower during a six-day period may implicate the Eighth Amendment is because their denial created such squalor that his living conditions fell below basic, humane conditions. Here, however, Artis fails to present any evidence -- namely, a declaration describing the conditions of his cell or his body during this time period -- from which a reasonable jury could conclude that the conditions of his confinement were so extreme as to implicate the Eighth Amendment. On this record, the court would have no choice but to grant summary judgment to defendant. *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) ("Summary judgment is the proverbial 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." (internal citation and quotation marks omitted)).

Given his *pro se* status, however, Artis will be given one last opportunity to meet his burden of proof by supplemental evidence from which a reasonable jury could infer that the alleged denial of running water, toilet paper and the opportunity to shower for six days resulted in such inhumane or deplorable conditions to support an Eighth Amendment claim. As detailed below, if plaintiff wishes to continue with this claim, then he must submit the necessary proffer on or before September 29, 2021. If he fails to do so, the court will grant this portion of defendants' motion and direct entry of judgment in favor of all defendants.

Finally, defendants seek summary judgment based on the fact that plaintiff sustained no injuries from the conditions of his confinement. In making this argument, defendants again rely on the Seventh Circuit's decision in *Lord*. However, since claims arising out of intolerable conditions of confinement present different types of injuries than self-harm claims, the *Lord* opinion proves an ill-fit. Specifically, conditions-of-confinement claims encompass a combination of conditions creating "a risk of particular discomfort and humiliation." *See Hope v. Pelzer*, 536 U.S. 730, 738 (2002); *see also Karow v. Est. of Heyde*, No. 14-CV-395-JDP, 2017 WL 1194740, at *9 (W.D. Wis. Mar. 30, 2017) (explaining that conditions-of-confinement deprivations include "exposing the inmate to substantial risks of bodily harm without justification, inflicting unnecessary pain, causing unnecessary humiliation, or offending contemporary standards of human decency"). As such, the court rejects defendants argument that plaintiff's claim fails as a matter of law because he lacks evidence of physical injuries or impaired health. Nonetheless, the lack of evidence of physical injuries or impaired health likely forecloses any claim for compensatory damages. *See, Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012) (under 42 U.S.C. § 1997e(e), a prisoner cannot obtain compensatory damages without proving a physical injury).[8]

---

[8] Because the court takes up the merits of defendants' motion on the basis that plaintiff has failed to proffer sufficient evidence to support a finding on the objective prong of his Eighth Amendment conditions of confinement claim, the court need not reach defendants Giroux and Anderson's qualified immunity defense, other than to note that the defense requires them to accept plaintiff's version of the facts in seeking qualified immunity, *see Taylor v. Ways*, 999 F.3d 478, 482 (7th Cir. 2021), which defendants failed to do here.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #28) is GRANTED IN PART AND RESERVED IN PART.  The motion is granted as to plaintiff's claims against defendants Price and Hibma, and reserved as to plaintiff's claims against defendants Anderson and Giroux.

2) Plaintiff may have until September 29, 2021, to offer additional evidence as to the actual conditions of his confinement during the six-day period from July 27 to August 2, 2018.

3) Should plaintiff proffer supplemental proof, defendants Anderson and Giroux may have 21 days to respond.  If plaintiff fails to submit additional evidence, the court will grant defendants Anderson and Giroux's motion for summary judgment and direct entry of judgment in favor of all defendants.

4) The trial date and all pretrial deadlines are STRUCK.

Entered this 8th day of September, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge